# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN WEECE, | Case No. 1:23-cv-00124-JLT-EPG-HC |
| Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS AND DENIAL OF PETITIONER'S MOTION FOR RECONSIDERATION |
| v. | |
| JAMES HILL,[1] | |
| Respondent. | (ECF No. 18) |
| | ORDER DIRECTING CLERK OF COURT TO SUBSTITUTE JAMES HILL AS RESPONDENT |

Petitioner John Weece is a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons discussed herein, the undersigned recommends denial of the petition for writ of habeas corpus.

## I.

## BACKGROUND

Petitioner was convicted by a jury in the Tulare County Superior Court of three counts of sex with a child ten years or younger, nine counts of oral copulation/penetration with a child under ten, thirty-two counts of forcible lewd acts on a child, two counts of lewd acts on a child,

---

[1] James Hill is the Warden of the RJ Donovan Correctional Institution, where Petitioner is currently housed. Accordingly, James Hill is substituted as Respondent in this matter. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 894 (9th Cir. 1996).

and one count of using a minor for sexual acts. <u>People v. Weece</u>, No. F077362, 2020 WL 7396540, at *1 (Cal. Ct. App. Dec. 17, 2020).  On April 2, 2018, Petitioner was sentenced to a determinate imprisonment term of three hundred years and eight months plus an aggregate indeterminate term of 210 years to life. (3 CT[2] 823–28.)

On December 17, 2020, the California Court of Appeal, Fifth Appellate District affirmed the judgment. <u>Weece</u>, 2020 WL 7396540, at *28. On March 10, 2021, the California Supreme Court denied the petition for review. (LDs[3] 29, 30.) Petitioner's state habeas petitions were denied by the Tulare County Superior Court, California Court of Appeal, Fifth Appellate District, and the California Supreme Court. (LDs 31–36.)

On January 27, 2023, Petitioner filed the instant federal habeas petition, raising the following claims for relief: (1) ineffective assistance of counsel; (2) prosecutorial misconduct; and (3) false witness testimony. (ECF No. 1 at 5–8.)[4] Respondent filed a motion to dismiss, arguing that dismissal is warranted because the petition is unverified, Ground Three is unexhausted and thus the petition is mixed, and Ground Three does not present a federal question. (ECF No. 14.) On July 12, 2023, the undersigned issued findings and recommendation, which allowed Petitioner to cure the verification deficiency by filing a declaration under penalty of perjury that the contents of the petition are true and correct, found that Ground Three could be liberally construed as asserting an ineffective assistance of counsel claim for trial counsel's failure to impeach prosecution witness Doe 3, as set forth in Petitioner's state habeas petition, and thus was cognizable and exhausted, and recommended denial of the motion to dismiss. (ECF No. 16.) On August 9, 2023, the assigned district judge adopted the findings and recommendation in full and denied the motion to dismiss. (ECF No. 17.)

On August 31, 2023, Petitioner filed a motion for reconsideration wherein he declared under penalty of perjury that "[t]he papers [he] filed with the United States Eastern District Court are true and correct." (ECF No. 18.) On October 18, 2023, Respondent filed an answer. (ECF No. 25.) On November 27, 2023, Petitioner filed a traverse. (ECF No. 26.)

---

[2] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 24.)
[3] "LD" refers to the documents lodged by Respondent. (ECF No. 24.)
[4] Page numbers refer to the ECF pagination stamped at the top of the page.

## II.

## STATEMENT OF FACTS[5]

*Prosecution case*

**Initial disclosure**

At trial, Doe 1 testified that, in February 2016, she watched a presentation at school that discussed abuse, child pornography, and inappropriate touching. The presenters explained a person could go to jail for having naked pictures of a child.

Doe 1 recalled an incident when defendant forced her to take inappropriate pictures of her sister, Doe 2, when she was nine years old. They were in defendant's shop behind his house and defendant told Doe 2 to take off her clothes; she undressed from the waist down. Defendant gave Doe 2 a vibrator and told Doe 1 to use his phone to take pictures of Doe 2 with the vibrator in her vagina. Defendant then deleted the pictures off his phone. Defendant never touched Doe 1, but she had seen him touching Doe 2 on her thighs over her clothes.

After the school presentation, Doe 1 got scared and stressed out; she could not eat. In the evening of February 11, 2016, Doe 1 told her mother, Ms. D., she was not feeling well. Doe 1 was pale and running a fever. That night, she eventually disclosed to her mother the incident when defendant forced her take pictures of Doe 2 " 'doing bad things.' " Ms. D. called her sister, Ms. M., who had a young daughter, Doe 3; Ms. D. explained what Doe 1 had told her. The next day, Ms. D., Ms. M., and Doe 1 spoke to Doe 2 while Doe 3 was in another room.

Ms. D. asked Doe 2 if anyone had ever touched her. Doe 1 was crying, and Doe 2 started crying. Doe 2 initially said no, but she eventually admitted defendant had touched her inappropriately. Ms. M. asked Doe 2 if Doe 3 should be left alone with defendant, and Doe 2 said no.

Ms. M. then went to speak to Doe 3 in another room. She asked Doe 3 if anyone had ever made her feel uncomfortable or touched her inappropriately. Doe 3 told her something happened with defendant that should not have happened. Ms. M. called the police and Detective Florence Cotton arrived and took over the investigation.

Ms. M. also called defendant's wife and told her to come to Ms. D.'s house and said it was defendant and the girls. According to defendant's wife, she felt like she was about going to have a heart attack; she understood Ms. M.'s statement to mean something inappropriate had happened. When defendant's wife arrived at Ms. D.'s house, a police officer was there, and Doe 2 was at the table. Defendant's wife asked Doe 2 if defendant had touched her inappropriately and Doe 2 started crying.

Detective Cotton spoke to Ms. D., Ms. M., and Doe 2. She prepared a report in which she documented what Doe 2 told her. She did not speak to eight-year-old Doe 3 because, given Doe 3's age, Detective Cotton thought it best for her to

---

[5] The Court relies on the California Court of Appeal's December 17, 2020 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

speak to a forensic interviewer. Detective Cotton told Ms. M. she would be contacting her to set up an interview with the child abuse response team (a CART interview).

Defendant's wife later spoke with Detective Cotton and, in response to questioning by Detective Cotton, defendant's wife reported she had a red vibrator. Defendant's wife then went back to her house. Defendant was working in Fresno that day, so he was not at home. Defendant's wife picked up her clothes, makeup bag, and $25,000 from their fire safe. She testified she initially planned to only take half of the money, but Ms. M. advised her not to leave it because defendant's wife would need it. Defendant's wife put the money in a bank account; defendant closed their other accounts. Four days later, defendant's wife called a lawyer because she was not going to "be married to somebody that had done something like that."

**Doe 2's reports of abuse**

At trial, Doe 2 testified defendant would touch and squeeze her breasts and had put his hands down her pants and touched her vagina more than five times. He touched her for the first time when she was nine years old. When Doe 2 was approximately 10 years old, she, Doe 1, and their mother lived with defendant and his wife while their house was under construction.

Doe 2 recalled an instance when defendant touched her vagina over her clothes when she and Doe 1 were wrestling with him. She specifically recalled more than once that she and defendant "would go to Lowe's [or Home Depot]; and on [their] way back, he would pull over by a dirt bike track and [digitally penetrate her vagina] while he masturbated." She remembered an incident when she and Doe 1 stayed with defendant while their mother and defendant's wife were on a trip to Arizona. According to Doe 2, defendant watched her take a shower and then asked her to dance naked for him. He also asked her to lay in his bed and he digitally penetrated her vagina while masturbating; then he inserted his penis in her vagina. Doe 2 testified most of the touching occurred when she was nine and 10 years old and she believed the touching stopped when she was a freshman in high school. She recalled an instance when defendant had a jobsite near Los Angeles and she went with him; they were on their way back when defendant pulled over, pulled her pants down, and touched her while he masturbated. She also recalled instances when defendant would rub her thigh.

**Doe 3's reports of abuse**

Doe 3's first CART interview occurred on February 17, 2016, five days after her initial disclosure. The prosecutor played the first CART interview for the jury.

A few months later, in May 2016, Ms. M. contacted Detective Cotton because Doe 3 had additional information to disclose. Detective Cotton contacted Doe 3 for a follow-up interview on May 13, 2016. Doe 3 reported to Detective Cotton that she had a conversation with her mother that triggered her memory regarding approximately five times when defendant put his hand down her pants and he digitally penetrated her. Doe 3 also reported defendant grabbed her hand and forced it on his penis three or four times. She recalled that defendant forced her mouth on his "private" at the shop at least three times; she had not previously reported this. One time, Doe 3 bit defendant and he got upset and did not speak to her for the rest of the day. In one incident while defendant's penis was in her mouth, a white fluid came into Doe 3's mouth while defendant's eyes rolled back.

4

Doe 3 reported that, three or four weeks before her initial disclosure, she was at defendant's shop with defendant and his wife when his wife left to go to the store. Doe 3 had to stay back with defendant, and he pulled down her shorts and began licking her "pussy." She had scratches from defendant pulling her pants down and bruises on her inner thighs. Doe 3 drew a picture of defendant's penis that day with two scars on it.

A year later, in May 2017, there was an incident at Doe 3's school that caused Ms. M. to contact law enforcement again and take Doe 3 in for an additional interview. An additional CART interview was conducted on June 7, 2017, and investigator Khoua Lopez observed the interview from another room. The prosecutor played a video of the second CART interview for the jury.

At trial, Doe 3 was 10 years old and in the fifth grade. She testified she had known defendant since she was very young and would spend time with him and his wife when she went to their house. Doe 3 would go to the shop of defendant and his wife after school almost every day and then go to their house until Ms. M. got off work. Doe 3 testified she enjoyed spending time with defendant. He would buy her candy and sodas and once bought her a teddy bear. Doe 3 used to consider defendant one of her best friends, but now she hated him.

She recalled that on February 12, 2016, she was at Ms. D.'s house when she was asked to go in the bedroom and watch television. Her mom then came into the bedroom and asked Doe 3 if anyone had ever touched her. Doe 3 said "no." Her "heart dropped to [her] stomach, because [she] knew someone said something." Doe 3 then told her mom defendant had "touched [her] on [her] privates in the wrong way." According to Doe 3, "everyone was ... telling their parents about what happened to them" so she "just told them what happened to [her]." Ms. M. did not ask her for specific details; instead, Ms. M. said "okay" and walked out of the room. The police arrived, but Doe 3 did not speak to them that day.

Doe 3 remembered the first CART interview when she was asked questions regarding what had happened to her, but Doe 3 did not tell everything that had happened because she was embarrassed. It was the first time Doe 3 had talked to anybody about details regarding what had happened with defendant. Doe 3 later spoke with Detective Cotton regarding what had happened with defendant.

Doe 3 testified she did not recall the first time that defendant touched her, but she believed it occurred when she was five or six years old. The first incident she remembered was defendant telling her that if she let him take pictures of her on the beach, he would buy her a swimsuit. He bought her a two-piece swimsuit and then took pictures of her on the beach. At trial, the prosecutor introduced photographs of Doe 3 from that day at the beach.

According to Doe 3, defendant touched her vagina with his hand between five and 10 times; some of those times he would put his fingers inside her vagina and move them up and down. Doe 3 testified defendant's penis touched her vagina and went inside. Defendant would also pull off her clothes and touch his penis to her bottom; sometimes she had underwear on, other times she did not. Doe 3 stated it was "very uncomfortable" and she asked him to stop, but he would not. This occurred more than three times but less than 10 times. The touching occurred both in the house of defendant and his wife and in their shop, but it usually occurred in the bedroom when defendant's wife was in the shower or not home. Doe 3 did not tell defendant's wife because she was nervous.

Doe 3 also testified defendant's genitals touched her mouth more than three times. He touched her breasts with his hands and mouth both over and under her clothes more than five times. He touched and squeezed her "butt" more than five times. He also put his mouth to Doe 3's private part more than three times. She recalled incidents when she saw white stuff come out of defendant's private part onto her stomach. Doe 3 testified defendant's private part touched her stomach more than three times. She also stated he kissed her on the lips multiple times. Ms. M. had seen defendant kiss Doe 3 on the lips in the past and it made her uncomfortable and she thought it was inappropriate.

Defendant told Doe 3 not to tell anyone about the touching or he would " 'get in really big trouble' " and "be really mad at [her]." He also threatened to hurt her family.

Doe 3 recalled a specific incident when she drove with defendant and his wife to a national park to see a big tree. They stopped at a rest stop so defendant's wife could use the restroom. While defendant's wife was inside, defendant unzipped his pants and grabbed Doe 3's hand and put it on his penis.

She recalled another incident when she was about six years old and she and defendant dropped off defendant's wife at the airport. Defendant reached over and touched Doe 3's genital area over her clothes. She told him to stop, but he would not. He would get "real mad" at her when she told him to stop.

The last time Doe 3 recalled something occurring, she and her cousin Doe 2 were at defendant's house; it was the night before she told her mother about the touching. Defendant took Doe 3 outside to look at some cars in back of the house, and he forced her to put her hand on his penis. She pulled away.

**Defendant's wife's testimony**

Defendant's wife also testified at trial. She explained she and defendant got married in 2001. They opened a business together. They eventually sold the business; "it was getting rough right before [they] sold it." After a certain period of time, the buyers of the company defaulted on their note, and defendant and his wife repurchased the business. Starting the business again caused defendant's wife some concern because she was worried about losing money. At that same time, defendant's son and his wife began living with defendant and his wife. It was apparent to defendant's wife that defendant's son and his wife did drugs.

Defendant's wife testified she babysat Doe 3 before Doe 3 was old enough to go to school. When Doe 3 started going to school, defendant or his wife would often pick her up and take her to their shop and then to their house. Defendant's wife would leave Doe 3 alone with defendant at times. She never noticed anything inappropriate or unusual between defendant and Doe 3.

Defense counsel asked whether defendant "had a problem and could not get an erection" about the time the abuse was reported; defendant's wife responded she did not know. Defense counsel then asked, "[I]s it not true that you were not having [a] sexual relationship with your husband, vaginal intercourse, because he could not get an erection?" Defendant's wife responded, "No, that's not true. That's not true."

Defendant's wife denied telling defendant's siblings or stating in front of them that "if they wanted to gain some kind of an advantage when there's a dispute, that all you had to do was allege that there was a sexual molestation taking place."

### Defense case

Defendant testified on his own behalf. He denied all of the allegations of sexual misconduct. Defendant testified Ms. D's daughters Doe 1 and Doe 2 lived with him and his wife for some time while their house was under construction. Defendant admitted he had a black flip phone. He denied asking Doe 2 to lay naked on a carpet in the shop when she and her sister lived with him or asking Doe 1 to take photographs of Doe 2. He also denied having Doe 2 use a vibrator on herself. Defendant recalled wrestling with Doe 1 and Doe 2 in the living room when they first moved in, but he denied grabbing Doe 2's vagina. He denied watching Doe 2 take a shower at any time, pulling her towel off, making her dance naked, or touching her breasts or vagina after she showered. One time, he heard Doe 2 scream and she ran out of the bathroom naked saying there was a wasp in the shower; that was the only time defendant saw Doe 2 naked. He recalled taking a trip to the Los Angeles area for work and that Doe 2 asked to go with him, so he took her along. He denied pulling off the road and touching her inappropriately during that trip. He testified Doe 2 went with him everywhere; but he denied ever touching her vagina while they were in the car. He recalled a time his wife went to Arizona with Ms. D.; he testified Doe 1 and Doe 2 asked to stay with him, he was not trying to get them to stay with him. He denied putting his penis inside Doe 2's vagina in his bedroom or asking her to use a vibrator on herself when the girls stayed with him. He also denied masturbating in front of Doe 2 or seeing her naked during that time.

Defendant also denied touching Doe 3's vagina or butt with his mouth, hand, or penis at the shop or in the house. He further denied grabbing Doe 3's hand and placing it on his penis or forcing her to touch his penis with her mouth. He recalled taking Doe 3 places in his vehicle, but he denied he ever touched her vagina or put his penis in or near her vagina while in his truck. He also denied threatening Doe 3. According to defendant, Doe 3 was his best friend besides his wife. He recalled going on trips to a national park and to Las Vegas with his wife and Doe 3, but he denied touching Doe 3's vagina or having Doe 3 touch his penis while his wife was in the bathroom on either trip. He remembered taking Doe 3 to Pismo Beach while on a work trip and buying her a bathing suit at Kmart. According to defendant, Doe 3 changed in the bathroom at the beach and asked defendant to take photographs of her to send to her mother.

Defendant explained that he purchased a company in 2003 and his wife began working for the company with him. In 2006, defendant sold the business. In 2013, defendant took the company back after the buyers defaulted on their payments; his wife was not happy about him taking the company back.

On February 11, 2016, defendant made an offer to buy the building where his shop was located. He planned to place a $100,000 down payment, which he had in a safe at his house. His wife was present when he made the offer. He saw his wife make a phone call immediately after he had the discussion about purchasing the building. Doe 3 was at the office and asked defendant if she could stay the night; defendant says yes. Doe 2 later asked to stay the night, so defendant, his wife, and Doe 3 went to pick her up. The next morning, defendant went to work around 5:00 a.m. His wife normally arrived between 6:30 and 6:45 a.m. but she arrived a little after 7:00 a.m. that day. He sensed something was different; his

wife had not done her hair or makeup. Defendant left for Fresno. On the drive, his wife called him and told him she was leaving the office to go home. On his way back to Tulare, defendant called and texted his wife, but she did not respond. He went to the house and the shop to look for her, but she was not at either. He became concerned and went back to the house. He checked the box where the money had been and realized it was empty.

According to defendant, there was supposed to be $126,000 in the house. Defendant started feeling sick and finally got a hold of Ms. M. Ms. M. told defendant his wife was having a nervous breakdown and did not want to speak to him. Defendant continued to try to reach his wife but to no avail. He heard from his son there were allegations of sexual molestation against him. Defendant was arrested on February 20, 2016.

An employee of defendant's company, Ricky H., testified he worked at the shop of defendant and his wife five days a week, and he recalled Doe 3 coming to the business regularly in 2015 and 2016. While working at the shop, Ricky could see inside the shop's office, where Doe 3 would stay when she was there. Ricky never saw defendant take off Doe 3's clothes or touch her inappropriately.

Defendant's former sister-in-law, Jan, testified she knew defendant's wife before she married defendant. Jan recalled attending a dinner with defendant's wife in 1982 when defendant's wife stated, if her daughter's biological father opposed her husband's adoption of that daughter, defendant's wife would claim the biological father had molested the daughter.

Defendant's brother, Doyle, testified defendant was previously married to the mother of Doyle's biological daughter. Doyle recalled an incident in 1988 when defendant's wife suggested to Doyle that he accuse defendant of child molestation in order to obtain visitation rights of his daughter.

***Verdict***

The jury convicted defendant of all the charges alleged to have been committed against Doe 3, counts 1–41. The jury also convicted defendant of committing count 46 against Doe 2, which related to the incident during which defendant had Doe 2 use a vibrator while Doe 1 took pictures. Additionally, in relation to that incident, the jury convicted defendant of count 53, using a minor for sex acts, related to Doe 1. Finally, the jury convicted defendant of count 52 for touching Doe 2's thigh. The jury acquitted defendant of counts 42–45 and counts 47–51, which related to certain other acts alleged to have been committed against Doe 2.

Weece, 2020 WL 7396540, at *1–5.

# III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed

8

by the United States Constitution. The challenged convictions arise out of the Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Davis v. Ayala, 576 U.S. 257, 268–69 (2015); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Williams, 529 U.S. at 413. Thus, if a petitioner's claim has been "adjudicated on the merits" in state court, "AEDPA's highly deferential standards" apply. Ayala, 576 U.S. at 269. However, if the state court did not reach the merits of the claim, the claim is reviewed de novo. Cone v. Bell, 556 U.S. 449, 472 (2009).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. In addition, the Supreme Court decision must "'squarely address[] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA and the Court must defer to the state court's decision. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2008) (alterations in original) (quoting Wright v. Van Patten, 552 U.S. 120, 125, 123 (2008)).

1      If the Court determines there is clearly established Federal law governing the issue, the

2  Court then must consider whether the state court's decision was "contrary to, or involved an

3  unreasonable application of, [the] clearly established Federal law." 28 U.S.C. § 2254(d)(1). A

4  state court decision is "contrary to" clearly established Supreme Court precedent if it "arrives at

5  a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

6  court decides a case differently than [the Supreme Court] has on a set of materially

7  indistinguishable facts." Williams, 529 U.S. at 413. A state court decision involves "an

8  unreasonable application of[] clearly established Federal law" if "there is no possibility

9  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

10  Court's] precedents." Richter, 562 U.S. at 102. That is, a petitioner "must show that the state

11  court's ruling on the claim being presented in federal court was so lacking in justification that

12  there was an error well understood and comprehended in existing law beyond any possibility for

13  fairminded disagreement." Id. at 103.

14      If the Court determines that the state court decision was "contrary to, or involved an

15  unreasonable application of, clearly established Federal law," and the error is not structural,

16  habeas relief is nonetheless unavailable unless it is established that the error "had substantial and

17  injurious effect or influence" on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)

18  (internal quotation mark omitted) (quoting Kotteakos v. United States, 328 U.S. 750, 776

19  (1946)).

20      AEDPA requires considerable deference to the state courts. Generally, federal courts

21  "look through" unexplained decisions and review "the last related state-court decision that does

22  provide a relevant rationale," employing a rebuttable presumption "that the unexplained decision

23  adopted the same reasoning." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). This presumption

24  may be rebutted "by showing that the unexplained affirmance relied or most likely did rely on

25  different grounds than the lower state court's decision, such as alternative grounds for affirmance

26  that were briefed or argued to the state supreme court or obvious in the record it reviewed." Id.

27      "When a federal claim has been presented to a state court[,] the state court has denied

28  relief," and there is no reasoned lower-court opinion to look through to, "it may be presumed that

the state court adjudicated the claim on the merits in the absence of any indication or state-law

procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. Where the state court reaches a

decision on the merits and there is no reasoned lower-court opinion, a federal court

independently reviews the record to determine whether habeas corpus relief is available under

§ 2254(d). <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th Cir. 2013). "Independent review of the

record is not <i>de novo</i> review of the constitutional issue, but rather, the only method by which we

can determine whether a silent state court decision is objectively unreasonable." <u>Himes v.</u>

<u>Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). The federal court must review the state court

record and "must determine what arguments or theories . . . could have supported, the state

court's decision; and then it must ask whether it is possible fairminded jurists could disagree that

those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

Court." <u>Richter</u>, 562 U.S. at 102.

**IV.**

**DISCUSSION**

**A.  Motion for Reconsideration**

As set forth in section I, *supra*, Respondent filed a motion to dismiss, arguing that

dismissal is warranted because the petition is unverified, Ground Three is unexhausted and thus

the petition is mixed, and Ground Three does not present a federal question. (ECF No. 14.) The

undersigned previously issued findings and recommendation, which allowed Petitioner to cure

the verification deficiency by filing a declaration under penalty of perjury that the contents of the

petition are true and correct, found that Ground Three could be liberally construed as asserting an

ineffective assistance of counsel claim for trial counsel's failure to impeach prosecution witness

Doe 3, as set forth in Petitioner's state habeas petition, and thus was cognizable and exhausted,

and recommended denial of the motion to dismiss. (ECF No. 16.) On August 9, 2023, the

assigned district judge adopted the findings and recommendation in full. (ECF No. 17.)

On August 31, 2023, Petitioner filed a "motion for reconsideration," wherein Petitioner

declares that Attorney Mugridge was not in court most of Petitioner's trial and there was

evidence on Petitioner's cell phone (videos, text messages, pictures) that the prosecution

withheld from trial. Petitioner also complains of the library's limited hours and notes that he could not get access to his legal mail until August 26, 2023. (ECF No. 18.) Based on the timing of the motion, it appears that Petitioner requests reconsideration of the Court's denial of the motion to dismiss. However, the contents of the motion for reconsideration are not related to the issues raised in the motion to dismiss. Moreover, the Court ruled in Petitioner's favor by denying the motion to dismiss. As it is unclear what ruling Petitioner wishes the Court to reconsider and what relief is being sought, the undersigned recommends that the motion for reconsideration be denied.

### B. Ineffective Assistance of Counsel

In his first and third claims for relief, Petitioner asserts ineffective assistance of trial counsel for "walking out" of the middle of trial and forcing Petitioner to accept representation from new counsel who allegedly had no experience and for failure to impeach prosecution witness Doe 3. (ECF No. 1 at 5, 8.) Respondent argues the state courts' rejection of the ineffective assistance of counsel claims was reasonable (ECF No. 25 at 15, 23.)

#### 1. *Strickland* Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." Id. at 687. To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 688, 687. Judicial scrutiny of counsel's performance is highly deferential. A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance. Id. at 687. To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different

1  result must be substantial, not just conceivable." <u>Richter</u>, 562 U.S. at 111–12 (citing <u>Strickland</u>,

2  466 U.S. at 696, 693).

3         When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of

4  the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense

5  counsel's performance fell below <u>Strickland</u>'s standard." <u>Richter</u>, 562 U.S. at 101. Moreover,

6  because <u>Strickland</u> articulates "a general standard, a state court has even more latitude to

7  reasonably determine that a defendant has not satisfied that standard." <u>Knowles v. Mirzayance</u>,

8  556 U.S. 111, 123 (2009) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "The

9  standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' and when the two

10  apply in tandem, review is 'doubly' so." <u>Richter</u>, 562 U.S. at 105 (citations omitted). Thus, "for

11  claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in

12  order to afford 'both the state court and the defense attorney the benefit of the doubt.'" <u>Woods v.

13  Donald</u>, 575 U.S. 312, 316–17 (2015) (quoting <u>Burt v. Titlow</u>, 571 U.S. 12, 15 (2013)). When

14  this "doubly deferential" judicial review applies, the appropriate inquiry is "whether there is any

15  reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 562 U.S.

16  at 105.

17         2.  <u>Trial Counsel "Walking Out" of Trial</u>

18         In his first claim for relief, Petitioner asserts ineffective assistance of trial counsel,

19  Attorney Mugridge, for "walking out" of the middle of trial and forcing Petitioner to accept

20  representation from Attorney Moran who allegedly had no experience. (ECF No. 1 at 5.) This

21  claim was raised in all of Petitioner's state habeas petitions. The Tulare County Superior Court

22  denied the petition, stating:

23                On January 25, 2022, Weece filed the instant petition for writ of

24               habeas corpus. He makes some connected claims that he received
              ineffective assistance of counsel, that the prosecutor engaged in

25               misconduct, and that there is insufficient evidence to support his
             convictions.

26                Petitioner Weece has not supported his claims with any facts. This

27               court has reviewed the unpublished appellate opinion and discerns
             no factual support for the contention that Weece's lawyer(s)

28               provided ineffective assistance of counsel. Weece has not attached
             any records, transcripts, or other documents to support his claim.

> Weece has thus presented no specific factual allegations which would constitute a basis for relief.

(LD 32 at 2; ECF No. 24-32 at 3.) The California Court of Appeal, Fifth Appellate District denied the petition without prejudice and stated that "[i]n any future habeas petition, petitioner must provide an adequate record and demonstrate exhaustion of legal remedies." (LD 34.) The California Supreme Court summarily denied the petition. (LD 36.)

The Supreme Court has "said that counsel should be 'strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment,' and that the burden to 'show that counsel's performance was deficient' rests squarely on the defendant." Titlow, 571 U.S. at 22–23 (quoting Strickland, 466 U.S. at 690, 687). Therefore, "[i]t should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" Titlow, 571 U.S. at 23 (second alteration in original) (quoting Strickland, 466 U.S. at 689). Here, Petitioner did not provide factual support for his ineffective assistance claim regarding counsel allegedly walking out of the trial. In fact, as set forth by Respondent in the answer, (ECF No. 25 at 17), the trial record establishes that: Petitioner was represented by both Attorney Mugridge and Attorney Moran, partners in the same firm, from the first day of the trial, (3 RT[6] 54; 2 CT 427); at the beginning of trial, Attorney Mugridge informed the court he had potential scheduling conflicts and that Attorney Moran would "finish up" and "do the closing argument and all that," (3 RT 52); Attorney Mugridge questioned witnesses, raised objections, and was present every day of the trial except for closing argument, (See, e.g., 3 RT 50; 4 RT 102; 5 RT 149, 154–68, 191–232; 6 RT 333, 401–16, 419–27; 7 RT 687–736, 745–59; 8 RT 843, 862, 967–69; 9 RT 1029–1122, 1144–48; 10 RT 1174; 11 RT 1369); and Attorney Moran participated throughout the trial, including questioning witnesses and raising objections, (See e.g., 5 RT 258–78; 5A RT 281–96, 306, 308–09; 6 RT 343, 356, 394, 428–90; 7 RT 556–94, 620–35; 8 RT 871–966; 10 RT 1183–88, 1239–77, 1291–98, 1304–24, 1335–43, 1345–61; 11 RT 1369–1472, 1501–07).

---

[6] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 24.)

1  Based on the foregoing, Petitioner has not overcome the "strong presumption that

2  counsel's conduct falls within the wide range of reasonable professional assistance," Strickland,

3  466 U.S. at 689, and under the "doubly deferential" AEDPA review of ineffective assistance of

4  counsel claims, the state court's denial was not contrary to, or an unreasonable application of,

5  clearly established federal law, nor was it based on an unreasonable determination of fact. The

6  decision was not "so lacking in justification that there was an error well understood and

7  comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562

8  U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of

9  counsel on the ground that trial counsel allegedly walked out of the trial.

10  　　　　3.  Trial Counsel Failed to Impeach Doe 3

11  　　　In his third claim for relief, Petitioner asserts a claim of false witness testimony, which

12  the Court has liberally construed as an ineffective assistance of counsel claim for trial counsel's

13  failure to impeach prosecution witness Doe 3, as set forth in Petitioner's state habeas petitions.

14  (ECF No. 1 at 8; ECF No. 16 at 4; ECF No. 17.) This claim was raised in all of Petitioner's state

15  habeas petitions. The Tulare County Superior Court denied the petition in a reasoned decision as

16  set forth in section IV(B)(2), *supra*. The California Court of Appeal, Fifth Appellate District

17  denied the petition without prejudice and stated that "[i]n any future habeas petition, petitioner

18  must provide an adequate record and demonstrate exhaustion of legal remedies." (LD 34.) The

19  California Supreme Court summarily denied the petition. (LD 36.)

20  　　　Petitioner appears to argue that counsel was ineffective for failing to impeach Doe 3

21  based on her faulty memory and inconsistent statements. However, as set forth by Respondent in

22  the answer, (ECF No. 25 at 24), the trial record belies Petitioner's assertion and demonstrates

23  that during cross-examination defense counsel repeatedly impeached Doe 3's memory and

24  inconsistent statements. (See, e.g., 8 RT 889–92, 897–903, 906–08, 914–30, 933–43, 947–66.)

25  "Defense counsel's cross-examination and impeachment of [Doe 3's] credibility placed her

26  performance well within the wide range of professional assistance demanded of criminal

27  attorneys," Mancuso v. Olivarez, 292 F.3d 939, 955 (9th Cir. 2002), and Petitioner fails to

28  identify what counsel could have done differently in the cross-examination of Doe 3 such that

1 there is "a reasonable probability that . . . the result of the proceeding would have been

2 different." Strickland, 466 U.S. at 694.

3       Based on the foregoing, Petitioner has not overcome the "strong presumption that

4 counsel's conduct falls within the wide range of reasonable professional assistance," Strickland,

5 466 U.S. at 689, and under the "doubly deferential" AEDPA review of ineffective assistance of

6 counsel claims, the state court's denial was not contrary to, or an unreasonable application of,

7 clearly established federal law, nor was it based on an unreasonable determination of fact. The

8 decision was not "so lacking in justification that there was an error well understood and

9 comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562

10 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of

11 counsel based on trial counsel's alleged failure to impeach Doe 3's testimony.

12       **C.  Prosecutorial Misconduct**

13       In his second claim for relief, Petitioner asserts that the prosecutor committed misconduct

14 by falsely stating that Doe 3's medical records corroborated her claims. Specifically, Petitioner

15 claims that the prosecutor falsely stated, "You have the medical records that show [Doe 3] got

16 UTI's frequently," and "As [Doe 3] was no longer around the defendant anymore, she got zero."

17 (ECF No. 1 at 7 (quotation marks and citations omitted).) Respondent argues that the state court

18 was not objectively unreasonable in rejecting Petitioner's prosecutorial misconduct claim. (ECF

19 No. 25 at 18.)

20       The prosecutorial misconduct claim was raised on direct appeal to the California Court of

21 Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The claim was

22 also raised in the petition for review, which the California Supreme Court summarily denied.

23 (LDs 29, 30). As federal courts "look through" summary denials and review "the last related

24 state-court decision that does provide a relevant rationale," Wilson, 138 S. Ct. at 1192, this Court

25 will examine the decision of the California Court of Appeal.

26       In denying the prosecutorial misconduct claim, the California Court of Appeal stated:

27         Defendant next contends the prosecutor repeatedly engaged in prejudicial
        misconduct.

28

### A. Standard of Review and Applicable Law

" ' " "[A] prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]' " ' " (*People v. Hill* (1998) 17 Cal.4th 800, 819.) "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury." (*People v. Morales* (2001) 25 Cal.4th 34, 44; see *People v. Mendoza* (2007) 42 Cal.4th 686, 700; *People v. Farnam* (2002) 28 Cal.4th 107, 167.) "The focus of the inquiry is on the effect of the prosecutor's action on the defendant, not on the intent or bad faith of the prosecutor." (*People v. Mendoza, supra*, at p. 700.) " 'A defendant's conviction will not be reversed for prosecutorial misconduct, however, unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 1010.)

### B. Waiver and Ineffective Assistance of Counsel

Here, defense counsel lodged no objections to the prosecutor's conduct defendant now challenges on appeal. " 'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety.' " (*People v. Hill, supra*, 17 Cal.4th at p. 820.) An exception is made if a timely objection or request for admonition would have been futile, or if an admonition would not have cured the harm caused by the misconduct. (*Ibid.*) "The reason for this rule, of course, is that 'the trial court should be given an opportunity to correct the abuse and thus, if possible, prevent by suitable instructions the harmful effect upon the minds of the jury.' " (*People v. Green* (1980) 27 Cal.3d 1, 27, overruled on other grounds in *People v. Martinez* (1999) 20 Cal.4th 225, 239.)

In his reply brief, defendant contends for the first time that his trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's challenged comments below. To prove ineffective assistance of counsel, a defendant must satisfy the two-part test of *Strickland v. Washington* (1984) 466 U.S. 668 requiring a showing of counsel's deficient performance and prejudice. (*Id.* at p. 687.) As to deficient performance, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Id.* at p. 688.) The prejudice prong requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) Prejudice must be affirmatively proved. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Where a defendant fails to show prejudice, a reviewing court may reject a claim of ineffective assistance of counsel without reaching the issue of deficient performance. (See *Strickland, supra*, at p. 697.)

However, when a defendant fails to raise an issue in the opening brief, raising it for the first time in a reply brief, we generally decline to address the issue or address it in a summary manner. (See *People v. Duff* (2014) 58 Cal.4th 527, 550,

fn. 9 [claim of ineffective assistance of counsel raised by defendant for the first time in reply brief is forfeited]; *People v. Harris* (2008) 43 Cal.4th 1269, 1290 [defendant's claim of ineffective assistance of counsel for failure to object to prosecutor's argument, made for first time in reply brief in response to waiver argument, "is as meritless as it is belated"]; *People v. Alvarez* (1996) 14 Cal.4th 155, 241, fn. 38 [" 'perfunctorily' " rejecting defendant's claim of ineffective assistance of counsel, made for the first time in reply brief and in a single paragraph].)

Nevertheless, here, as we explain *post*, even if these issues had been adequately preserved for our review, defendant has failed to establish the prosecutor engaged in prejudicial misconduct. Thus, both defendant's prosecutorial misconduct and ineffective assistance of counsel claims fail.

### C. Analysis

Defendant argues nine specific instances of alleged prosecutorial misconduct. He contends the prosecutor: (1) made "material misrepresentations" about Family Law and his wife's community property interest in the marital assets, (2) misrepresented the status of his and his wife's community property, (3) misrepresented California community property law regarding dissolution of the marital estate, (4) falsely accused the defense of misleading the jury, (5) made false claims about the timing of the molestation allegations that took place in defendant's home and shop, (6) falsely claimed the medical records corroborated the Doe 3's claims, (7) falsely claimed that defendant's ability to achieve an erection and ejaculation was not relevant to the charges, (8) misrepresented the DNA data, and (9) misrepresented defendant's testimony. We address and reject each of defendant's contentions in turn.

. . .

#### 6. Alleged misrepresentation of medical records corroborated Doe 3's claims

Defendant next argues the prosecutor falsely stated Doe 3's medical records corroborated her claims.

### (a) Relevant Procedural History

Ms. M. testified there was a certain period of time during which Doe 3 was getting urinary tract infections. She recalled a specific instance in 2014 when Doe 3 had sharp pain when she urinated, and she was diagnosed with a urinary tract infection. The prosecutor moved to introduce Doe 3's medical records related to that incident as an exhibit. In response to further questioning, Ms. M. testified Doe 3 had zero urinary tract infections since defendant stopped seeing her.

In argument, the prosecutor directed the jury to Doe 3's medical records and stated:

> "Do these medical records prove that the defendant put his penis in [Doe 3]'s vagina? No. Why did you hear about them? Because it shows that Doe 3 had pain. She had pain in her stomach, and she had pain when she was urinating. And her mom took her to the doctor.... [¶] But what do we know about these medical records? What do we know about these urinary tract infections that [Doe 3] got frequently? That she got zero after she stopped being around the defendant. Not one, not less frequent, not as

many as before. Zero. None. And that's corroboration. That's circumstantial evidence."

During defense counsel's closing argument, she, too, discussed Doe 3's urinary tract infections:

"Also, of great significance, and you'll be able to see it back in the jury room, is that [Doe 3], in 2014, did go to the doctor for urinary tract infections. Her mother testified that her mother gets urinary tract infections. Their whole family gets urinary tract infections. That's not the issue. The issue is during that visit the doctor actually did a full exam. No, they didn't use instruments, but they did an exam. Look at the medical exam when you're back in the jury room. It says 'genital exam.' It says 'normal.' So if a little girl was being raped by a grown man, it would not be normal. Again, this information was never requested by Detective Cotton."

And in rebuttal, the prosecutor again noted, "You have the medical records that show that [Doe 3] got UTIs frequently. As soon as she wasn't around the defendant anymore, she got zero."

**(b) Analysis**

Defendant contends the prosecutor's statement in rebuttal constituted misconduct because it was a false statement; rather, "[t]here was no medical evidence that [Doe 3] had frequent urinary tract infections that ceased when she was separated from [defendant]." The People concede the medical records only discuss one urinary tract infection rather than frequent urinary tract infections. However, they argue the prosecutor's misstatement was harmless because there was other evidence Doe 3 got frequent urinary tract infections, namely Ms. M.'s testimony. Accordingly, they contend there was not a reasonable probability the jury would have rendered a more favorable outcome absent the prosecutor's statement. We agree with the People and again, we find no prejudice.

Here, both the prosecutor and defense counsel argued Doe 3 went to the doctor for urinary tract infections (plural). But they both directed the jury to review the medical records, which reflected a single urinary tract infection diagnosis. Ms. M. testified Doe 3 got urinary tract infections during a certain period of time and that Doe 3 had not had any such infections once she stopped seeing defendant. The jury was instructed: "Evidence is the sworn testimony of witnesses and exhibits that were admitted into evidence," and that nothing the attorneys say is evidence, and we presume the jury followed this instruction. On this record, we cannot conclude the prosecutor's brief comment prejudiced defendant.

Weece, 2020 WL 7396540, at *10–11, 17–18.

The Supreme Court "has recognized that prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" Greer v. Miller, 483 U.S. 756, 765 (1987) (alteration in original) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Greer,

483 U.S. at 765 (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). As "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power,'" it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (citations omitted). "On habeas review, constitutional errors of the 'trial type,' including prosecutorial misconduct, warrant relief only if they 'had substantial and injurious effect or influence in determining the jury's verdict.'" Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting Brecht, 507 U.S. at 637–38).

"[T]he test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). The Supreme Court has held that when a state court's harmless error "decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 576 U.S. 257, 269 (2015) (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). That is, Petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Ayala, 576 U.S. at 269–70 (internal quotation marks omitted) (quoting Richter, 562 U.S. at 103). See Mitchell v. Esparza, 540 U.S. 12, 18 (2003) (per curiam) ("We may not grant [the] habeas petition, however, if the state court simply erred in concluding that the State's errors were harmless; rather, habeas relief is appropriate only if the [state court] applied harmless-error review in an 'objectively unreasonable' manner.").

Here, Petitioner claims that the prosecutor falsely stated that the medical records establish Doe 3 frequently had urinary tract infections ("UTI"), plural, when the medical records reflected a single UTI diagnosis. The Court finds that the California Court of Appeal was not objectively unreasonable in determining that any error was harmless. As noted by the state court, there was

other admissible evidence (*i.e.*, Ms. M.'s testimony) that Doe 3 got UTIs for a period of time, (7 RT 752), and both the prosecutor and defense counsel directed the jury to review the medical records, (12 RT 1591, 1622). Further, the jury was instructed "'[e]vidence' is the sworn testimony of witnesses [and] the exhibits admitted into evidence," "[n]othing that the attorneys say is evidence," and "[i]n their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." (3 CT 680.) And a "jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

Based on the foregoing, the Court finds that the state court's harmless error determination regarding the prosecutor's erroneous statement during closing argument was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on his second claim, and it should be denied.

# V.

## RECOMMENDATION & ORDER

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and Petitioner's motion for reconsideration (ECF No. 18) be DENIED.

Further, the Clerk of Court is DIRECTED to SUBSTITUTE James Hill as Respondent in this matter.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the

objections shall be served and filed within fourteen (14) days after service of the objections. The assigned United States District Court Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **January 19, 2024**            /s/ Erica P. Grosjean

UNITED STATES MAGISTRATE JUDGE